**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MICHAEL FRISCHKORN**
Frischkorn Law LLC
Fortville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana



FILED

Feb 20 2012, 9:07 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PATRICIA CLAYWELL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 29A02-1106-CR-572 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable J. Richard Campbell, Judge
Cause No. 29D04-1003-FD-1127

**February 20, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Patricia Claywell ("Claywell") was convicted after a jury trial of operating a vehicle while intoxicated in a manner that endangers a person,[1] elevated to a Class D felony on the basis of a prior conviction. On appeal, she raises the following restated issue: Whether there was sufficient evidence of her intoxication to support her conviction.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On March 8, 2010, the State charged Claywell with Class A misdemeanor operating a vehicle while intoxicated in a manner that endangers a person, Class C misdemeanor operating a vehicle with a Schedule I or II controlled substance or its metabolite in the body, Class D felony operating a vehicle while intoxicated in a manner that endangers a person, and Class D felony operating a vehicle with a Schedule I or II controlled substance or its metabolite in the body. *Appellant's App.* at 9-10. On the State's motion, the trial court dismissed the Class C misdemeanor and the Class D felony counts pertaining to operating a vehicle with a Schedule I or II controlled substance or its metabolite in the body.

Claywell was tried on the other two counts during a March 10, 2011 jury trial. The evidence most favorable to the conviction revealed that, on April 23, 2008, Officer John Gonzalez ("Officer Gonzalez"), an off-duty reserve officer with the Ingalls Police Department in Madison County, was traveling northbound on I-69 in Hamilton County when he noticed a vehicle being operated in an erratic fashion. Officer Gonzalez called

---

[1] *See* Ind. Code §§ 9-30-5-2(b), 9-30-5-3(a)(1).

2

911 to report the driver's behavior. Meanwhile, he followed the vehicle as it exited the highway, took a U-turn, and drove back onto southbound I-69. The female driver, who was later identified as Claywell, then swerved in front of a semi truck, causing the truck to "jog over and almost push vehicles out of his lane." *Tr*. at 25. By this time, Fishers Police Department Officer Dale Hensley ("Officer Hensley") responded to the 911 call and began to follow the vehicle. Officer Gonzalez stopped following the vehicle and did nothing further.

Officer Hensley followed the vehicle for about a mile. Noting that the car had an expired license plate and was traveling in and out of its lane, Officer Hensley pulled the car over. After being stopped, Claywell had trouble retrieving her driver's license, and while looking for her registration, she kept asking the officer what she was looking for. Believing that Claywell was impaired and that it was necessary to administer standard field sobriety tests, Officer Hensley asked Claywell to step out of the car. As Claywell walked to the rear of her vehicle, Officer Hensley could see that her left ankle was bandaged and that she limped.

Officer Hensley first administered the Horizontal Gaze Nystagmus ("HGN") test; a test that measures impairment by analyzing the involuntary jerking of the subject's eyes. At trial, Officer Hensley explained that a subject fails if the officer observes four of six clues; Claywell had all six clues. Officer Hensley then asked Claywell to recite the alphabet starting at the letter C and ending at the letter N. Claywell replied, "C, D, F, G, H, I, J, K, L, M, N, K." *Id*. at 46. By missing the letter E and ending with the letter K, Officer Hensley determined that Claywell failed the test. *Id*. Finally, he asked her to

3

count backwards starting from 103 and stopping at the number 87. Again, based on her answers, Officer Hensley determined that Claywell had failed the test.

At some point, Claywell took a portable breath test ("PBT"), which showed no presence of alcohol. Even so, because Officer Hensley believed that Claywell was impaired, he requested the assistance of a Drug Recognition Expert to examine Claywell.[2] Officer Hensley transported Claywell to the Fishers Police Department for further examination. Sergeant Tim Byrne ("Sergeant Byrne"), a Drug Recognition Expert for the Carmel Police Department, responded to Officer Hensley's request.

Officer Hensley told Sergeant Byrne that Claywell's PBT showed no sign of alcohol and that Claywell had failed the HGN, the alphabet test, and the backward count. He also told the Sergeant that Claywell "had an unsteady balance and that her speech was slurred." *Id*. at 91. Sergeant Byrne proceeded to conduct a Drug Recognition Evaluation ("DRE"). As part of the DRE, he asked Claywell about her medical history; checked her pulse, which was elevated; and checked the size of her pupils, which were slightly larger than normal. He asked what time it was, and Claywell replied that it was around midnight—it was 1:20 a.m. Claywell reported that she had last slept the previous night for six or seven hours. Claywell told Sergeant Byrne that she had injured her left foot in an auto accident and that she was clinically blind in her left eye. Because some medical conditions can cause temporary impairment, Sergeant Byrne confirmed that Claywell did not have epilepsy nor was she required to take insulin. Inquiring further into her health,

_____

[2] As the State explained during its opening statement, a Drug Recognition Expert is a specialized law enforcement officer who has gone through specialized training to find out if somebody indeed is on drugs. *Tr*. at 17. "And to be able to narrow it down to a classification of what [drug] that is even." *Id*.

4

Sergeant Byrne learned that, with the exception of her left eye, Claywell's only physical defect was the injured foot for which she had been prescribed Lyrica, a painkiller. *Id*. at 96.

Sergeant Byrne testified at trial that, when he asked Claywell if she knew why she had been stopped, "She said she really did not know why she was stopped and that she thought she had been driving fine." *Id*. Sergeant Byrne observed that Claywell's speech was slurred and that she occasionally stuttered as she spoke. Sergeant Byrne conducted his own HGN test, a Vertical Gaze Nystagmus ("VGN") test, and a lack of convergence test; all tests that are included in the DRE protocol. Even taking into account Claywell's impaired eye, Sergeant Byrne concluded that Claywell failed these tests.

Continuing to follow the DRE protocol, Sergeant Byrne conducted two divided attention tests—the Romberg Test and finger to nose test. These tests reveal "how well a person can multitask." *Id*. at 83, 103. Claywell failed the Romberg test because of a sway from front to back and a poor estimation of the passage of time. Claywell also almost fell down when she closed her eyes and tilted her head back to perform the finger to nose test. Sergeant Byrne then checked Claywell's pulse, took her blood pressure with a blood pressure cuff and stethoscope and took her temperature with a digital thermometer. *Id*. at 109-11. The blood pressure was elevated, and her temperature was "towards the high end of normal 99.6." *Id*. at 112. The officer checked Claywell's pupils, which were "larger than normal." *Id*. at 113. Next, he checked her nasal and oral cavities looking for signs of extended drug use, but found none. Sergeant Byrne did a physical examination of Claywell looking for injection sites and checked her pulse again.

5

He did not find any injection sites and her pulse was still elevated. He next conducted a physical examination of her arms and shoulder area and found normal muscle tone. Finally, Sergeant Byrne conducted an interview where he asked about her drug use, and Claywell informed him that she had taken two Lyrica tablets earlier in the evening for her heel pain. *Id*. at 116.

Sergeant Byrne compared the results of Claywell's examination with his "DRE matrix" and formed the opinion "that [Claywell] was under the influence of a central nervous system depressant and that she was unable to operate a motor vehicle safely." *Id*. at 118. When asked, Claywell submitted to a blood draw. Sergeant Byrne explained that the "blood draw is taken simply to show that the call [the officer] made with the drug category is accurate." *Id*. "It is mostly for certification purposes"; the blood test itself is not proof of intoxication." *Id*. at 119. The blood test results were not introduced or used in any fashion at trial. During the State's case in chief, defense counsel cross-examined Sergeant Byrne, and highlighted the fact that a drug recognition specialist, like Sergeant Byrne, only had to have an 80% accuracy rate to be certified initially and to keep his certification. *Id*. at 124.

Following the trial, the jury found Claywell guilty of "operating a vehicle while intoxicated endangering a person." *Id*. at 190. Claywell waived her right to a jury trial regarding the second phase of the trial and, instead, stipulated to the fact that she had a prior conviction for operating while intoxicated within the previous five years. Based on this evidence, the trial court entered a conviction on operating a vehicle while intoxicated endangering a person as a Class D felony and dismissed Claywell's count alleging the

6

same charge as a Class A misdemeanor.

During the June 15, 2011 sentencing hearing, the trial court sentenced Claywell to a term of 730 days in the Indiana Department of Correction ("DOC") with 545 days suspended. Of the executed sentence, fourteen days were ordered served in the DOC followed by 171 days on a direct commitment to the Hamilton County Community Corrections Electronic Home Monitoring Program. *Appellant's App.* at 67. That same day, pauper counsel was appointed. Claywell now appeals.

## DISCUSSION AND DECISION

Claywell argues that the evidence was not sufficient to support her conviction of operating a vehicle while intoxicated in a manner that endangers a person. Specifically, she contends that there was insufficient evidence of the element of intoxication. Our Supreme Court recently reiterated the standard of review to apply in examining a challenge to the sufficiency of the evidence:

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State,* 867 N.E.2d 144, 146–47 (Ind. 2007) (quotations, footnote, and citations omitted) (emphasis in original).

7

To convict Claywell of operating while intoxicated as a Class D felony, the State had to prove beyond a reasonable doubt that she "operate[d] a vehicle while intoxicated . . . in a manner that endangere[d] a person," and that she "ha[d] a previous conviction of operating while intoxicated that occurred within the five (5) years immediately preceding the . . . violation." Ind. Code §§ 9–30–5–2, 9-30-5-3. Claywell does not contest that she was operating a vehicle in a manner that endangered a person. Additionally, because Claywell stipulated to having a prior conviction, we need only address her contention that there was insufficient evidence of the element of intoxication to support her conviction for operating while intoxicated.

A person who is intoxicated is under the influence of alcohol, a controlled substance, a drug other than alcohol or a controlled substance, or a combination of the above substances, "so that there is an impaired condition of thought and action and the loss of normal control of a person's faculties." Ind. Code § 9-13-2-86. On appeal, Claywell appears to argue that, in the absence of a conclusive blood or urine test, the evidence cannot be sufficient to prove that she was intoxicated. *See Appellant's Br.* at 8 ("The sole basis for the conviction is Sergeant Byrne's testimony that Ms. Claywell was intoxicated by an unknown central nervous system depressant based only on his examination without the confirmation of a drug test."). We disagree.

Claywell cites to various cases in which evidence was deemed sufficient to prove the element of intoxication. In *Vanderlinden v. State*, this court determined that the following evidence was sufficient to support a finding that Vanderlinden had been intoxicated: she admitted to having consumed alcohol on the evening in question; the

officer smelled alcohol on her breath during the traffic stop; the officer noted her eyes appeared red, and she failed one field sobriety test. 918 N.E.2d 642, 644 (Ind. Ct. App. 2009), *trans. denied* (2010). The court was unpersuaded by Vanderlinden's argument that the smell of alcohol and red eyes could be present after consuming even a small amount of alcohol. Instead, our court concluded that the defendant's admission of having consumed alcohol, the smell of alcohol on her breath, and her red eyes, when coupled with defendant having failed a standard field sobriety test "provide[d] sufficient evidence of intoxication. Vanderlinden's assertions to the contrary [were] an invitation to reweigh the evidence, which we cannot do. *Id.*

In *Curtis v. State,* the defendant conceded at trial that his actions were impaired, but attributed his impairment to a diabetic episode. 937 N.E.2d 868, 874 (Ind. Ct. App. 2010). Our court, on appeal, concluded that the following evidence supported the finding that Curtis was intoxicated by marijuana: the smell of marijuana emanating from the defendant's car; his glassy, bloodshot eyes; the defendant's fumbling with his registration; and the fact that he swayed when outside of his vehicle. Notwithstanding Curtis's refusal to do a blood draw, the officer who conducted the DRE concluded that Curtis was under the influence of marijuana. *Id.* at 871. Our court noted that Curtis did not press on appeal his defense that he had diabetes, "but if he did, we would reject the invitation to revisit the trial court's finding on this factual question." *Id.* at 874. Claywell contends that, unlike the facts in *Vanderlinden* and *Curtis*, here, the officers did not smell marijuana, alcohol, or anything else. *Appellant's Br.* at 9.

9

To convict Claywell, the State had to prove that she operated a vehicle while "intoxicated" in a manner that endangered a person. Ind. Code § 9-30-5-2. As noted above, a person may be intoxicated by alcohol or a drug other than alcohol when that drug (or combination of drugs) creates "an impaired condition of thought and action and the loss of normal control of a person's faculties." Ind. Code § 9-13-2-86. Unlike the facts in *Vanderlinden* and *Curtis*, here, there would be no odor created by Claywell ingesting a drug. Officer Hensley testified that Claywell drove in an impaired condition, but that her PBT revealed no presence of alcohol. *Tr.* at 48. To determine the cause of the impairment, Officer Hensley asked Sergeant Byrne, a certified drug recognition expert, to perform DRE protocol on Claywell.

At trial, Sergeant Byrne explained that the DRE program, which began in the late 1970s and early 1980s, was developed when officers began to see a trend of impaired drivers who's PBTs showed the presence of little or no alcohol. *Id.* at 75. Sergeant Byrne testified that DRE is a program "designed to determine whether or not an individual is under the influence of a drug as opposed to alcohol. And/or rule out that there is a medical condition causing what we are seeing as potential impairment in an individual." *Id.* at 73. He then explained the various tests used in DRE protocol, the comprehensive education required for an officer to obtain DRE certification, and the continuing education required for an officer to maintain such certification.

The following testimony came in at trial without objection. Officer Gonzales noted a vehicle driving in an erratic manner, and even though he was off duty, he was sufficiently concerned to call 911. Officer Hensley responded to the 911 call and saw

10

Claywell continue to drive in and out of her lane. When stopped, Officer Hensley noted that Claywell was visibly impaired and had difficulty producing both her license and her vehicle registration. While looking for her registration, Officer Hensley had to repeatedly remind her what she was looking for. Claywell failed the HGN, the alphabet test, and the backward count. She also had unsteady balance, and her speech was slurred.

Sergeant Byrne conducted a DRE. As part of this evaluation, he asked Claywell about her medical history and confirmed that she did not have epilepsy or take insulin—factors known to cause impairment. Continuing with the DRE, Sergeant Byrne conducted a second HGN, a VGN, and a convergence test—all of which Claywell failed. He also checked Claywell's pulse, which was elevated, and checked the size of her pupils, which were slightly larger than normal. Claywell's sense of time was also off; she thought it was more than an hour earlier than it was. Claywell failed the two divided attention tests, which indicated her inability to "multitask." *Id*. at 83. Sergeant Byrne testified that it is important to pass the divided attention tests "[b]ecause operating a vehicle requires a person to do several things at one time. *Id*. at 63. If somebody is not able to do two things at one time, that is another sign of impairment. *Id*.

After completing the DRE, Sergeant Byrne testified, again without objection, that "[b]ased upon everything I was told, everything I observed and all the tests that I conducted myself, it is my opinion that the individual was under the influence of a central nervous system depressant and that she was unable to operate a motor vehicle safely." *Id.* at 118. This evidence, coupled with Claywell's admission that she ingested two painkillers earlier in the evening, constitutes sufficient evidence from which a jury could

11

conclude beyond a reasonable doubt that Claywell was intoxicated. Because Claywell does not challenge any of the other elements required to convict her of operating a vehicle while intoxicated in a manner that endangers a person, elevated to a Class D felony on the basis of a prior conviction, we find sufficient evidence to support her conviction.

Affirmed.

BARNES, J., and BRADFORD, J., concur.